# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40005

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

JUAN PERALES,

> Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

March 30, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and CLEMENT and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Chief Judge:

Defendant-Appellant Juan Perales appeals the district court's denial of his motion to suppress several bundles of cocaine discovered and seized after he consented to the search of his vehicle. Because we conclude the district court did not clearly err in finding that Perales's consent to the search was voluntary, we AFFIRM.

## I.    BACKGROUND

On January 13, 2016, Agent Michael Tamez ("Agent Tamez") of the Kingsville Specialized Crimes and Narcotics Task Force observed a Chevrolet Silverado pickup truck with a non-functioning brake light; a computer check

No. 17-40005

of the vehicle's license plate indicated that the truck might not be insured. Because both the faulty brake light and driving without valid liability insurance are violations of the Texas Transportation Code, Agent Tamez initiated a traffic stop.[1] Agent Tamez asked Perales, who was the sole occupant of the truck, for his identification and proof of liability insurance. Perales provided his identification, but could not readily locate his insurance documentation. According to Agent Tamez, "[Perales] looked underneath the seat. He looked near the left door panel . . . and eventually he went to the glove compartment. And the documentation was inside the glove compartment," which was completely empty except for the insurance documents. Agent Tamez observed that the insurance policy had been purchased the day before the traffic stop and was only good for thirty days. At the suppression hearing, Agent Tamez testified that, in his experience as a drug interdiction officer, it was common in instances of drug trafficking for the driver of the vehicle to be unfamiliar with the location of insurance documents and for the interior of the vehicle to lack signs of personalization. It was also common for smugglers to get a 30-day liability insurance policy so that if the vehicle is seized carrying contraband, "the [smuggling] organization itself does not lose out on money by buying a six month or year long (sic) insurance policy."

After receiving Perales's identification and insurance paperwork, Agent Tamez asked Perales "how he was doing," and asked him to "exit the vehicle and step to the rear." Perales complied, and Agent Tamez "asked him to sit inside the front seat of [the] patrol unit." Perales again complied. Agent Tamez climbed into the driver's seat of the patrol unit, explained the traffic violation to Perales, and told Perales that he was going to issue him a warning. Agent

---

[1] Agent Jacob Moya was riding along with Agent Tamez and sat in the back seat of the patrol unit during the traffic stop.

2

No. 17-40005

Tamez began preparing the warning, which he testified required that he both verify and input information into three different computer systems using three different screens. While preparing the warning, Agent Tamez noticed that the name and address listed on the vehicle registration differed from that included on Perales's driver's license. Agent Tamez then asked Perales a series of questions about several subjects, including how long Perales had owned the truck, where he was traveling to and from, and the purpose for his trip. Perales responded that he owned the truck and had purchased it three months prior, and that he was traveling to Houston from Brownsville to find a job. Although Agent Tamez observed that Perales was not nervous when answering his questions, Agent Tamez testified that Perales gave inconsistent or deceptive answers to his questions. Agent Tamez also drew suspicion from the make and model of Perales's vehicle, which, in his experience and training, was commonly used by drug smugglers to hide drugs. Agent Tamez asked Perales whether the truck contained any drugs or weapons, and Perales responded it did not.

Based on his interaction with Perales, Agent Tamez asked for consent to search the vehicle. Perales offered consent, and Agent Tamez began searching the vehicle. At the time of the request, Agent Tamez had yet to return Perales's driver's license or issue him the warning citation. Perales remained seated in the front seat of Agent Tamez's patrol unit unrestrained.[2]

Agent Tamez and Agent Moya searched Perales's vehicle and ultimately found 2.99 kilograms of cocaine concealed in the engine compartment of the truck.[3] Agent Tamez also found a notebook piece of paper with directions to

---

[2] Agent Tamez testified that Perales was not seat-belted in or handcuffed as he sat in the front seat of the patrol unit, and that the doors were not locked.

[3] The record does not indicate that Agent Moya had any meaningful interaction with Perales during the traffic stop other than to assist in searching Perales's truck after Agent Tamez received consent.

No. 17-40005

Charleston, South Carolina, in Perales's back pocket. Perales was subsequently charged by criminal complaint with conspiring to possess with intent to distribute, and possessing with intent to distribute, more than 500 grams of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B).

Before trial, Perales sought to suppress the bundles of cocaine discovered during the search of the truck, arguing, *inter alia*, that he did not voluntarily consent to the search of his vehicle.[4] The district court held an evidentiary hearing on Perales's motion to suppress, during which it heard testimony from Agent Tamez and watched a video recording of the traffic stop that was captured on Agent Tamez's body camera. At the close of testimony and after hearing additional argument from both sides, the district court concluded that Agent Tamez conducted a "pretty routine traffic stop," and that "[Perales] clearly gave consent." As is relevant to the instant appeal, the district court found that Agent Tamez did not use coercive police procedures, although it ambivalently opined that placing Perales in the patrol unit might have been coercive.[5] Concerning the voluntariness of Perales's consent, the district court concluded that "there are factors going both ways" with "more factors . . . in favor of finding the consent to be voluntary," and that, given the totality of the circumstances, "the consent was voluntary under the law." The district court orally denied Perales's motion to suppress, and, after a two-day jury trial, Perales was convicted of the substantive drug count. At sentencing, the district

---

[4] Perales also initially argued that the traffic stop was impermissibly extended beyond its initial scope. The district court found that Perales's detention was not delayed or prolonged in any way. Perales does not challenge that finding on appeal.

[5] The district court held: "The presence of coercive police procedures, I don't find any, only to the extent that he was in the police car. If you want to call that coercive, you may have a different issue here. The officer acted very professionally in the way he treated the defendant."

No. 17-40005

court imposed the statutory mandatory minimum sentence of 60 months' imprisonment and four years of supervised release.

## II.     DISCUSSION

### A. Standard of Review

In reviewing a district court's grant of a motion to suppress evidence obtained in violation of the Fourth Amendment, this court reviews the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). Voluntariness of consent is a factual inquiry that is reviewed for clear error. *United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014). A factual finding is not clearly erroneous if it is plausible when reviewed in the light of the entire record. *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001). "Where a court has based its denial on live testimony, 'the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses.'" *Rounds*, 794 F.3d at 338 (quoting *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005)). We view the evidence introduced at a suppression hearing in the light most favorable to the prevailing party, here, the Government. *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999).

### B. Analysis

Perales argues that the district court erred in finding his consent voluntary. "A search conducted pursuant to consent is excepted from the Fourth Amendment's . . . [warrant and probable cause] requirements." *United States v. Brown*, 567 F. App'x 272, 279 (5th Cir. 2014) (unpublished) (quoting *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002)). "Where the Government asserts that no search warrant was required because the officer obtained voluntary consent for the search, the [G]overnment must prove by a preponderance of the evidence that consent was freely and voluntarily given." *Id.* (citing *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997)).

No. 17-40005

Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). This court uses a six-factor evaluation to determine whether a defendant voluntarily consented to a search. The factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Wise*, 877 F.3d 209, 221–22 (5th Cir. 2017) (citing *United States v. Williams*, 365 F.3d 399, 406–07 (5th Cir. 2004)). "Although all six factors are relevant, no single factor is dispositive." *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993).

Perales does not challenge much of the district court's application of the six-factor test on appeal. He only argues that the district court's consent finding was based on the erroneous conclusion that Agent Tamez did not use coercive procedures. Perales primarily relies on this court's statement in *United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008), that "an officer's retention of identification documents suggests coercion," to argue that Agent Tamez's failure to turn over Perales's identification documents prior to requesting consent necessarily requires a finding of coercion. Perales's contentions are unavailing.

Contrary to Perales's assertions, *Cavitt* did not establish a bright-line rule that an officer's retention of identification documents requires a finding of coercion. Indeed, the language in *Cavitt* suggests the contrary: an officer's retention of identification documents is a factor the court considers when determining whether the officer used coercive police procedures, but is otherwise not controlling or dispositive. *See id*. Further, *Cavitt* and other cases

Perales cites to support his position suggest that the court's concern about coercion is often preceded by an independent constitutional violation, i.e., where an officer has impermissibly prolonged a traffic stop or initiated a stop without reasonable suspicion. *See id.* (noting that an officer's retention of the driver's identification documents after an unconstitutionally prolonged stop weighed in favor of a finding of coercion, but rendering inconclusive whether the officer's search of Cavitt's vehicle was voluntary); *see also United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993) (noting, without holding, that an immigration agent's retention of the defendant's alien registration cards at the time he asked for permission to search the defendant's vehicle was an element of coercion because the agent initiated the stop without reasonable suspicion, but pretermitting its inquiry into the voluntariness of the defendant's consent); *Brown*, 567 F. App'x at 280 n.5 (5th Cir. 2014) (unpublished) (observing that, "[a]lthough it is coercive for a police officer to retain identification documents after a lawful stop is complete," the traffic stop "was not completed when [the officer] sought [the defendant's] consent," and the officer's retention of the defendant's license was therefore not coercive).

To the point, Agent Tamez's initial stop was justified, and, during the traffic stop, Agent Tamez was permitted to examine Perales's driver's license and registration and to run computer checks. *See United States v. Brigham*, 382 F.3d 500, 507–08 (5th Cir. 2004). Approximately ten minutes elapsed between Agent Tamez's initial encounter with Perales and the moment he asked for Perales's consent. Although it is unclear how long it took Agent Tamez to complete the checks and at what point the computer checks were actually completed, it is clear that they were not completed when Agent Tamez sought Perales's consent. That Agent Tamez had not completed running the necessary computer checks before seeking Perales's consent, and that Perales does not challenge the length of time that elapsed before Agent Tamez sought

consent, are both crucial to our determination that the district court did not clearly err in finding Agent Tamez's retention of Perales's identification documents was not coercive.

Perales cites as an additional indication of coercion that Agent Tamez placed Perales in the front seat of his patrol unit to conduct the computer checks at the time he requested consent. We find this contention unpersuasive.

The district court twice noted the oddity of Agent Tamez's practice of placing a detainee in the front seat of his patrol unit during a traffic stop, and suggested this could, under certain circumstances, constitute coercive police procedures. At least one case supports this conclusion. In *United States v. Zavala*, 459 F. App'x 429 (5th Cir. 2012) (unpublished), Zavala was asked to sit in the passenger seat of the patrol cruiser while the state trooper conducted an investigation into Zavala's itinerary. *Id.* at 431. The trooper sought Zavala's consent to check his vehicle for drugs at a checkpoint several miles away. *Id.* The court noted that the trooper coercively obtained Zavala's consent while he was in the police cruiser because, although the doors were not locked, he was in the cruiser at the trooper's direction and needed the trooper's permission to exit the cruiser. *Id.* at 433–34. However, Zavala's position in the front seat of the patrol unit was one of many factors signaling coercion. The court also considered that the trooper made clear he intended to conduct a drug sniff on Zavala and was forceful in his instruction to have Zavala consent to the search. *Id.* Taken together, these factors led the court to conclude that the trooper used coercive police procedures. *See id.*

Here, Agent Tamez's interaction with Perales was cordial, and the record does not indicate that Agent Tamez used verbal threats or intimidation to obtain Perales's consent or that an independent constitutional defect preceded or accompanied Agent Tamez's placing Perales in his patrol unit. *See id.* at 433–34; *see also United States v. Jones*, 234 F.3d 234, 242–43 (5th Cir. 2000),

*abrogated in part on other grounds by United States v. Pack*, 612 F.3d 341 (5th Cir. 2010) (holding that an officer impermissibly prolonged a traffic stop beyond the completion of computer checks, and observing without deciding that the officer's subsequent attempts to obtain consent while still in possession of the driver's identifying documentation and while the driver was in the back seat of the patrol unit could lead to an inference of coercion). Therefore, the district court did not clearly err in finding that Agent Tamez did not act coercively by placing Perales in the front seat of his police cruiser to run computer checks.[6]

Perales also offers that Agent Moya's presence during the traffic stop added a "modicum of coerciveness" to the situation, and cites *United States v. Washington*, 992 F. Supp. 2d 789, 794 (N.D. Ohio 2014). In *Washington*, the court found coercion where two armed police officers "flanked" the defendant's vehicle during a traffic stop and were involved "directly" at all times during the stop. *Id.* Here, in contrast, there is no indication that Agent Moya exited the patrol unit during the traffic stop or otherwise interacted with Perales prior to searching his truck. Agent Moya's presence was therefore not coercive.

Finally, Perales passively asserts that Agent Tamez used coercive procedures because, prior to asking for consent, Agent Tamez told Perales he would only be issued a warning. In support, Perales cites *United States v.*

---

[6] Importantly, Agent Tamez testified at the evidentiary hearing that it is his common practice to place detained drivers in the front seat of his patrol unit, where he can easily input information into his computer system to issue a warning or citation. The court ultimately accepted that fact and found that Agent Tamez's practice did not indicate coercion. Agent Tamez's justification for placing detained drivers in his patrol unit is analogous to those cited by the officer in *United States v. Torres-Borunda*, 269 F. App'x 431, 433 (5th Cir. 2008) (unpublished) (per curiam), in which a panel of this court held that placing a driver in a patrol unit to obtain information from him can be a matter of convenience, and not coercion, if the officer is obtaining information from the driver at the time he requests consent. Here, that Agent Tamez placed Perales in his patrol unit to more easily input necessary information to complete the computer checks seems more a matter of convenience than coercion.

*Robertson*, 614 F. App'x 748 (5th Cir. 2015) (unpublished) (per curiam), in which the court determined that the officer engaged in coercive police procedures when he twice stated "before you go" as part of his request for consent to search the defendant's vehicle. *Id.* at 749. However, in *Robertson*, the officer had already issued the traffic citation and the defendant had turned to leave when the officer stated: "[B]efore you go, we have problems with people smuggling things on the interstate . . . Can I search your vehicle before you go?" *Id.* The district court found this to be coercive, and a panel of this court was "not firmly convinced that a mistake was made." *Id.* at 750. Here, although Agent Tamez asked Perales a series of questions related to his itinerary and ownership of the vehicle, Agent Tamez's announcement that he would issue Perales a warning is not analogous to the statements made in *Robertson*.

Because it is plausible from the record that Perales was not coerced into consenting to the search of his vehicle, the district court's conclusion that Agent Tamez did not use coercive police procedures was not clearly erroneous. We also hold that the district court's voluntariness determination was not erroneous.

## III.   CONCLUSION

Considering the foregoing, we uphold the district court's finding that Perales voluntarily consented to the search of his vehicle, and affirm the district court's denial of Perales's motion to suppress.