# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 11, 2021

Lyle W. Cayce
Clerk

No. 20-10588

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

CLARENCE BASS,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CR-00480-M-1

Before HIGGINBOTHAM, SOUTHWICK, and ENGELHARDT, *Circuit Judges*.

KURT ENGELHARDT, *Circuit Judge:*

Clarence Bass was approached by police officers after a tip was received that he was illegally selling CDs outside of a store in a high-crime area. After Bass voluntarily opened the trunk of his vehicle, police arrested Bass for unlawful labeling of CDs and searched him and his vehicle, and discovered a loaded pistol, magazine, cash, drugs, and drug paraphernalia. Because Bass had 13 prior felony convictions, he was subsequently charged

federally with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 924(e).  Following a bench trial, Bass was convicted and sentenced to 180 months imprisonment.  Bass appeals the district court's denial of his motion to suppress, the imposition of an Armed Career Criminal Act ("ACCA") enhancement, and the firearm sentencing enhancement. We AFFIRM.

## I.

On May 25, 2016, an off-duty police officer observed Clarence Bass standing beside the open trunk of a parked vehicle in a convenience-store parking lot.  The off-duty officer, Christopher Langlois, reported the activity to the police unit assigned to that high-crime area, explaining that Bass was standing next to a vehicle and appeared to be selling items from the truck. Based on this tip and a prior complaint that Officer Otoneal Boudet had received about Bass illegally selling CDs in front of local businesses from his purple Dodge Challenger with a red stripe, Officer Boudet was dispatched to respond to the suspicious activity in the area.  While driving up to the scene, Officer Boudet activated his body camera to record the interaction.

When Officer Boudet approached Bass, Bass closed his car truck and disclosed that he was selling CDs and had more CDs in the trunk.  When Officer Boudet asked Bass whether there was anything illegal in the vehicle, Bass answered, "Just the CDs."  Bass also asked Officer Boudet about the complaint made against him, and explained he had been charged with illegally selling CDs before.

Based on the initial disclosure and suspecting that Bass was illegally selling CDs, Officer Boudet asked Bass for consent to search the vehicle. Another man who was observed talking with Bass, Mr. Floyd, was detained and told another officer at the scene, Officer Williams, that Bass gave him a CD without charge.  This statement conflicted with what Bass had told

Officer Boudet. In an appeal to Officer Boudet's leniency, Bass explained that he was currently on parole.

Officer Boudet again asked to search the vehicle. Bass was hesitant and informed Officer Boudet that the vehicle was registered to his wife. When Bass pulled out a cell phone to allegedly call his wife to seek consent to search the vehicle, Officer Boudet told Bass not to make any calls out of concern for the officers' safety. Officer Boudet continued to question Bass and answered Bass's question as to why someone complained about his activity. After a back-and-forth dialogue that lasted several minutes, Bass offered to and then did open his trunk, where bootlegged CDs and DVDs were displayed.

When asked by Officer Boudet, Bass said he was not carrying any personal identification. Officer Boudet told Bass that he and Officer Williams saw illegally labeled CDs and DVDs in plain view in the trunk. At that point, Officer Boudet asked Bass to sit on the curb and told Bass that he was detained, and that they would search the vehicle. Bass was placed under arrest for unlawfully labeling CDs and DVDs. Officers searched the trunk of the vehicle where they found boxes and bags full of CDs and DVDs. Officer Boudet then started searching the inside of the vehicle around the driver's seat and found a backpack in the back of the vehicle that contained several small baggies of cocaine that totaled 1.5 grams, 442.9 grams of marijuana also wrapped in small baggies, and 221.5 grams of synthetic cannabinoids.

Before putting him in the police car, Officer Williams patted Bass down and searched him. In his pockets, police found a loaded pistol, a loaded handgun magazine, $477 in cash, several small baggies of marijuana, and 5.6 grams of codeine.

Bass was charged by the state of Texas with illegally labeling unauthorized records, possession of marijuana, possession of a controlled

No. 20-10588

substance, possession with intent to deliver a controlled substance, and unlawful possession of a firearm by a felon. Bass had previously been convicted of possession of a controlled substance with intent to deliver, a felony under Arkansas law.  Because Bass had 13 prior felony convictions, he was subsequently charged federally in the Northern District of Texas with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 924(e).

On July 2, 2017, Bass moved to suppress (1) all the items that were seized from him and his vehicle after he was detained by the two Dallas police officers on May 25, 2016, including the 9mm handgun found in his pocket, which forms the basis of Count One of the Indictment, and (2) all the statements he made during his encounter with the police on May 25, 2016, about previously selling CDs and being on parole, arguing the items were improperly obtained without reasonable suspicion for his detention, without probable cause, and without consent.

The district court held a hearing on November 29, 2017, and heard live testimony from Officers Boudet and Langlois.  The Government also offered video from Officer Boudet's body camera. After the hearing, the district court denied the motion to suppress, explaining in a written order that police had reasonable suspicion to stop Bass, that he voluntarily opened the trunk of his car, that police had probable cause to arrest him and search him and his vehicle incident to that arrest, and that the statements he made to police were voluntarily made during the *Terry* stop and not the result of a custodial interrogation requiring a *Miranda* warning.

Bass waived his right to a jury and proceeded to an uncontested bench trial with counsel on December 18, 2017, to preserve his right to appeal the court's denial of his suppression motion. The Government offered a stipulation of evidence in which Bass stipulated to the admission of the

testimony and exhibits from the suppression hearing, stipulated to the admission of the handgun that was found in his pocket, and to having previously been convicted of a crime punishable by imprisonment for a term exceeding one year. The Government admitted the gun and testimony from an ATF agent regarding its interstate nexus. The district court found Bass guilty of being a felon in possession of a firearm.

A probation officer prepared a presentence investigation report (PSR), which assigned a base offense level of 14. The initial PSR calculated his advisory guideline range at 188 to 235 based on a total offense level of 31 and a criminal history category of VI. The PSR then applied a four-level enhancement for possessing a firearm in connection with another felony offense under USSG §2K2.1(b)(6)(B), which increased the base offense level to 18. Finding that Bass had at least three prior convictions for serious drug offenses, the PSR applied an enhancement under the ACCA to give Bass an offense level of 33.

With a two-level reduction for acceptance of responsibility and a criminal history category of VI, the amended final advisory guideline range was 188 to 235 months. At sentencing, the Government moved for an additional one-level reduction for acceptance of responsibility, which resulted in a final guideline range of 180 to 210 months. While Bass objected to the PSR's application of the firearm and ACCA enhancements, the court overruled those objections and sentenced Bass to the mandatory minimum sentence of 180 months.

Bass now appeals the district court's denial of his motion to suppress, the imposition of the ACCA enhancement, and the firearm sentencing enhancement.

No. 20-10588

II.

Bass first argues the district court erred in denying the motion to suppress after finding the police had reasonable suspicion to detain Bass and probable cause to arrest him and search his vehicle.  In evaluating a district court's denial of a defendant's motion to suppress, we review factual findings, including credibility determinations, for clear error, and we review legal conclusions de novo. *United States v. Gomez*, 623 F.3d 265, 268–69 (5th Cir. 2010) (citing *United States v. Solis*, 299 F.3d 420, 435 (5th Cir. 2002)). "Factual findings are clearly erroneous only if a review of the record leaves this Court with a 'definite and firm conviction that a mistake has been committed.'" *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009) (quoting *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001).

"Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005). Finally, we review the evidence in the light most favorable to the Government as the prevailing party. *Id*.  The district court's ruling should be upheld if there is any reasonable view of the evidence to support it.  *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014).

*The Fourth Amendment*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV.  That text says nothing about suppression.  *See United States v. Leon*, 468 U.S. 897,

6

906 (1984) ("The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands."). It is well-established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement. *United States v. Iraheta*, 764 F.3d 455, 462 (5th Cir. 2014).

The Fourth Amendment contemplates searches and seizures based "upon probable cause." U.S. CONST. amend. IV. Probable cause requires "a fair probability" that a suspect has committed a crime. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This court has recognized that, under *Terry*, officers may briefly detain an individual on the street for questioning, without probable cause, when they possess reasonable, articulable suspicion of criminal activity. *United States v. Williams*, 880 F.3d 713, 718–19 (5th Cir. 2018). Reasonable suspicion is considerably easier for the government to establish than probable cause. *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993).

### *Reasonable Suspicion*

Bass argues that he was detained without reasonable suspicion and that "[t]here are no specific articulable facts from Officer Langlois that support his alleged suspicion that something illegal was going on nor that something was being sold as he saw no transaction."

When analyzing the legality of an investigative stop, this court makes a two-part inquiry. *United States v. Pack*, 612 F.3d 341, 349-350 (5th Cir. 2010). First, we consider whether the officer's decision to make the stop was justified at its inception. *Id*. at 350. Second, we determine whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *Id*.

Our assessment of reasonable suspicion is based on the totality of the circumstances. *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).

No. 20-10588

Reasonable suspicion can vest through the collective knowledge of the officers involved in the search-and-seizure operation. *Id.* The collective knowledge theory for reasonable suspicion applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts. *See United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). The record supports that is what happened in this case.

The facts leading up to Bass's arrest are straightforward. An off-duty officer called in a tip about suspicious activity to the unit assigned to a high-crime area known for drug dealing, and the officer explained that a man was standing next to his vehicle and appeared to be selling items from the trunk. Reasonable suspicion can be formed by a tip so long as the information is marked by "indicia of reliability." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (quoting *Adams v. Williams*, 407 U.S. 143, 143 (1972)). Further, tips specific to an area well-known for illegal activity can give law enforcement the reasonable suspicion they need to detain a defendant. *See United States v. Hernandez*, 477 F.3d 210, 215 (5th Cir. 2007).

Officer Boudet approached Bass who, by Bass's own admission, was selling CDs in an area known to law enforcement as a high-crime zone. As noted above, when Officer Boudet asked Bass whether there was anything illegal in the vehicle, Bass answered, "Just the CDs." Bass was driving without a license and disclosed he was on parole.[1] Officer Boudet had

---

[1] *See U.S. v. Thompson*, 408 F.3d 994 (8th Cir. 2005) (finding an officer had reasonable grounds to suspect defendant of criminal activity, which justified officer's inquiry about contents of trunk and request to search vehicle, after the defendant admitted to driving without a license while on parole); *United States v. Hester*, 910 F.3d 78 (3rd Cir. 2018) (explaining officer's investigatory seizure of a parked vehicle was supported by reasonable suspicion, and thus did not violate the Fourth Amendment, where a vehicle was parked in front of a store with a known history of narcotics-related activity in a high-crime area).

No. 20-10588

previously received another complaint from a business in the area that a man matching Bass's description was selling CDs and DVDs out of a vehicle that matched the specific description of Bass's car. Bass's behavior and response to Boudet's questions supported the officer's suspicion consistent with previous arrests he had made for illegal transactions. In determining whether reasonable suspicion exists, an officer's inferences based on knowledge gained through specialized training and experience routinely play a significant role in law enforcement investigations. *Kansas v. Glover*, 140 S. Ct. 1183, 1189-1190 (2020). The district court did not err finding reasonable suspicion justified the initial stop by Officer Boudet.

### *Prolonged Detention*

Bass next argues that, even assuming there was a valid investigatory detention, it was unreasonably prolonged in violation of the Fourth Amendment. An investigatory detention should not last longer than necessary to either verify or dispel the officer's original suspicion "unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Estrada*, 459 F.3d 627, 630 (5th Cir. 2006). There is no "constitutional stopwatch" on investigatory stops. *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc). Rather, the court assesses whether police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.*

Officer Boudet questioned Bass about his activity for the first five minutes of their interaction. Within roughly the first minute of questioning, Bass told Officer Boudet that he had illegal CDs in his car. Bass acknowledged he was selling CDs and DVDs, that he didn't have any identification, he didn't own the vehicle he was driving, and he had previously been charged with illegally selling CDs. The combined totality of this information justified Officer Boudet's continued investigation and the

9

No. 20-10588

questioning was not unreasonable. *See Brigham*, 382 F.3d at 507; *Pack*, 612 F.3d at 361 (explaining that minutes into a valid stop, an officer may request a driver's license and vehicle registration and run a computer check thereon). Officer Boudet did not unreasonably prolong Bass's investigatory stop.

*Consent*

Bass next argues that the district court erred by concluding that he freely and voluntarily consented to the search of his vehicle.[2] A search conducted pursuant to consent is excepted from the Fourth Amendment's warrant and probable cause requirements. *See United States v. Perales*, 886 F.3d 542, 545–46 (5th Cir. 2018). Whether consent was given voluntarily is a question of fact reviewed under a clearly erroneous standard. *United States v. Blevins*, 755 F.3d 312, 326 (5th Cir. 2014). Bass argues he was coerced to open his trunk, and at most, he *only* consented to a search of his trunk. Once general consent is given, police may search all containers found within the vehicle unless the consent is expressly limited by the suspect. *See United States v. Crain*, 33 F.3d 480, 484-485 (5th Cir. 1994). Absent any limitation

---

[2] Despite Bass's argument that he never consented to a search of the vehicle, consent is not dispositive. This court need not determine whether the search exceeded the scope of Bass's consent because police had probable cause to arrest Bass and search him and his vehicle incident to arrest. And even if probable cause for Bass's arrest did not exist, the search of his car was reasonable under the automobile exception to the Fourth Amendment's warrant requirement.

A search incident to a lawful arrest is a well-recognized exception to the warrant requirement. *See Chimel v. California*, 395 U.S. 752, 762-63 (1969). When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. *Riley v. California*, 573 U.S. 373, 383 (2014). The scope of a search incident to an arrest is broad enough to include the interior of a vehicle if the arrestee was a recent occupant of the vehicle and it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009).

No. 20-10588

placed by the suspect, consent to search a car will support an officer's search of unlocked containers within it. *United States v. Iraheta*, 764 F.3d 455, 462–63 (5th Cir. 2014). The record does not support that Bass expressly limited his consent to the trunk.

Officer Boudet testified that, when Bass opened his trunk, a spindle of CDs labeled with permanent marker were in plain view. When paired with his knowledge about the prior complaints against Bass for illegally selling CDs and Bass's admission that he was previously convicted for similar conduct, Officer Boudet had probable cause to believe that Bass was committing a crime and make an arrest.

The Government must prove Bass voluntarily consented to the search by a preponderance of the evidence. *United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014). We use a multi-factor test to determine whether consent was voluntary, in which we consider:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000).

Several factors support a finding of voluntariness. Bass was calm and cooperative when speaking with Officer Boudet. The interaction was cordial, and the record does not indicate that Officer Boudet used verbal threats or intimidation to obtain Bass's consent to search the vehicle. The record demonstrates that Bass was aware he had the right to refuse consent. Because no single factor is dispositive and because several factors supported a finding of voluntariness, we conclude that, viewing these facts in the light

11

most favorable to the Government and under the highly deferential standard which we are compelled to apply on review of a denial of a suppression motion after a hearing with live testimony, there is no clear error in the district court's finding that Bass voluntarily consented to the search of his car. *See Estrada*, 459 F.3d at 634. Therefore, under the totality of the circumstances specific to this case, the consensual car search did not violate Bass's Fourth Amendment rights. Because there is no clear error, we affirm the district court's finding that Bass's consent was voluntary.

### *Miranda*

At the suppression hearing, Bass clarified he was seeking to suppress statements he made early in his encounter with Officer Boudet about selling CDs and being on parole. *Miranda*'s procedural safeguards attach "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *United States v. Chavez*, 281 F.3d 479, 486 (5th Cir. 2002) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). To ascertain whether an individual was in custody, we examine all of the circumstances surrounding the interrogation, but ultimately ask "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*.

The district court found that the statements made by Bass were made at a time when the encounter was still characterized as a *Terry* stop, and Bass volunteered this information when he was not in custody. *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody."). Bass freely shared the information with Officer Boudet. It is clear from the record that Bass was not in custody within the meaning of *Miranda*. Because "[a]pproaching someone who is in a public place … and asking questions does not constitute a seizure," *United  States*

*v. Hernandez*, 279 F.3d 302, 207 (5th Cir. 2002), Bass was not seized under the Fourth Amendment, and thus not in custody under the Fifth Amendment, when he made these statements.

Reviewing the totality of the circumstances, we find the officers had probable cause to arrest Bass and search his vehicle subsequent to arrest. Although the totality of the circumstances suggest that Bass was not free to leave, his restraint had not yet reached the level necessary to necessitate *Miranda* warnings. We affirm the district court's denial of Bass's motion to suppress his voluntarily given statements made prior to being in custody.

## III.

Bass acknowledges that the Supreme Court recently held that the "serious drug offense" definition in 18 U.S.C. § 924(e) "requires only that the state offense involve the conduct specified in the federal statute; it does not require that the state offense match certain generic offenses." *Shular v. United States*, 140 S. Ct. 779, 782 (2020). Nonetheless, Bass argues that the ACCA sentencing enhancement was improperly applied to him because the statute governing his prior convictions is overly broad and the language of the enhancement unconstitutionally vague. We review the sentencing court's findings of fact for clear error and preserved challenges to legal conclusions underlying a district court's application of the ACCA de novo. *United States v. James*, 950 F.3d 289, 291 (5th Cir. 2020).

The ACCA dictates that a defendant convicted under 18 U.S.C. § 922(g) is subject to a minimum sentence of 15 years if he has three prior convictions for "a serious drug offense." *See* 18 U.S.C. § 924(e)(1). When applied to state law convictions, this means an offense "involving manufacturing, distributing or possessing with intent to manufacture or distribute a controlled substance … for which a maximum term of imprisonment of ten years or more is prescribed by law." *See* 18 U.S.C. §

No. 20-10588

924(e)(2)(A)(ii). The PSR determined that Bass had five qualifying convictions, all of which were possession of a controlled substance with intent to deliver in violation of Arkansas Code § 5-64-401.

Bass argues that the definition of "delivery" of a controlled substance under Arkansas law contains various means of violating the Arkansas statute, including by "offering to sell" a controlled substance, which fall outside the scope of the sentencing guidelines' definition of a controlled-substance offense. Bass asserts that the Arkansas statute cannot support his ACCA enhancement because its definition of "delivery" means that a defendant could be convicted without actually possessing a controlled substance or without having actually delivered the substance. But this is unlike cases in which other states' statutes have been found to be broader than the generic offense because they include "offer to sell" as a way of distributing or delivering a controlled substance. *United States v. Madkins*, 866 F.3d 1136 (10th Cir. 2017) (Kansas's statute); *United States v. Hinkle*, 832 F.3d 569 (5th Cir. 2016) (Texas's statute). Arkansas' statute states the following:

> "Deliver" or "delivery" means the actual, constructive, or attempted transfer from one (1) person to another of a controlled substance or counterfeit substance in exchange for money or anything of value, whether or not there is an agency relationship.

Ark. Code. § 5-64-101(f) (1992).

Unlike *Madkins* or *Hinkle*, the Arkansas statute did not include "offer to sell" as an option, so those cases do not mandate the same result. To the contrary, statutes including virtually identical definitions of "deliver" have been upheld as within the generic offense. *United States v. Goldston*, 906 F.3d 390, 397 (6th Cir. 2018) (Tennessee's statute); *United States v. Maldonado*, 864 F.3d 893, 900 (8th Cir. 2017), *cert*. denied, 138 S. Ct. 702 (2018)

No. 20-10588

(Nebraska's and Iowa's statutes). Bass fails to show that the Arkansas "delivery" language is broader than the generic offense or the guideline definition of the offense.

Bass acknowledges that this argument is undermined by the recent Supreme Court decision in *Shular* holding that Section 924(e)(2)(A)(ii)'s "serious drug offense" definition "requires only that the state offense involve the conduct specified in the federal statute" rather than requiring that the state offense match certain generic offenses. 140 S. Ct. at 782. The Court's unanimous decision held that the conduct specified in the ACCA's definition of serious drug offense, rather than a matching of elements of a generic offense, is the basis for determining whether a defendant's prior conviction under state law qualifies as a predicate for sentence enhancement under the ACCA. In *Shular*, the defendant had prior convictions under a Florida statute that makes it a crime to "sell, manufacture, or deliver, or possess with intent to sell, manufacture, or deliver, a controlled substance." *Id.* at 784. The Florida statute at issue in *Shular* is *almost identical* to the Arkansas statute under which Bass was previously convicted.

Further, this court recently examined and rejected the argument presented by Bass surrounding the definition of "delivery" in light of *Shular* involving a similar Texas statute. In *United States v. Prentice*, the defendant received an ACCA enhancement based on a prior Texas conviction for possession of a controlled substance with intent to deliver. 956 F.3d 295, 297 (5th Cir. 2020), *cert.* denied, 2020 WL 7132459 (Dec. 7, 2020). Arguing that his Texas drug conviction could not be considered a "serious drug offense" supporting an ACCA enhancement post-*Shular*, the defendant asserted that a "state offense necessarily requires intent to 'distribute' drugs only if one could not commit the offense without intent to actually hand over drugs." *Id.* at 300. "*Shular* dictates that the Texas offense of possessing with intent to

15

deliver is conduct involving 'distribution' of controlled substances under the ACCA." *Id.*

In light of *Shular*, persuasive authority in our sister circuits, and this court's precedent, the district court correctly concluded that Bass's convictions could serve as predicates for his ACCA enhancement.

IV.

Lastly, Bass argues that the district court erred by enhancing his offense level by four levels because he did not possess a firearm in connection with another felony offense. We review the district court's application of the Sentencing Guidelines de novo. *United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010). A district court's determination that a firearm was used or possessed in connection with another felony offense for purposes of U.S.S.G. § 2K2.1(b)(6)(B) is a factual finding that is reviewed for clear error. *United States v. King*, 773 F.3d 48, 52 (5th Cir. 2014). "A factual finding is not clearly erroneous if it is plausible, considering the record as a whole." *Id.*

Under Section 2K2.1(b)(6)(B), "another felony offense" is defined as "any federal, state, or local offense, other than the firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1, cmt. n.14(C). Application of the enhancement depends on the type of felony alleged. *United States v. Jeffries*, 587 F.3d 690, 692 (5th Cir. 2009). A drug-trafficking offense means an offense under federal, state, or local law that prohibits the possession of a controlled substance with intent to distribute. *See* U.S.S.G. § 2L1.2 cmt. n. 1(B)(iv). If the offense involves drug trafficking, as is the case here, the firearm enhancement automatically applies if "a firearm is found in close proximity to drugs, drug manufacturing materials, or drug paraphernalia." *Jeffries*, 587 F.3d at 692.

No. 20-10588

The record shows that after Bass was searched subsequent to arrest, a firearm was discovered on his person and drugs were discovered on his person and in his vehicle. Bass was later charged by the state with possession of and intent to deliver controlled substances, and the PSR cites those state drug charges and his illegal labeling charge as the felony offenses connected to his firearm possession. Bass's state drug-trafficking charge alone is enough to support the firearm enhancement. *See United States v. Alcantar*, 733 F.3d 143, 148 (5th Cir. 2013).

Bass cites no authority to support his assertion that Section 2K2.1(b)(6)(B) is not applicable to his sentence because he was not suspected of drug activity when they arrested him. This court recently affirmed a defendant's Section 2K2.1(b)(6)(B) enhancement for possessing a firearm while engaged in drug-trafficking activity where police discovered a loaded firearm, magazines, and drugs at the defendant's residence while arresting him for an unrelated state parole violation. *See United States v. Browni*, 797 F. App'x 854, 855-56, 859 (5th Cir. 2020).

The district court could adopt the facts as described by the PSR unless Bass presented "rebuttal evidence or otherwise demonstrate[d] that the information in the PSR is unreliable." *See United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007). Here, the district court went further at the sentencing hearing and heard testimony from Officer Christopher Langlois, the officer that reported the suspicious activity. He discussed the facts and circumstances surrounding the arrest, including the 449 grams of marijuana, scales, and empty Ziplocs that were very consistent "with the sale and packaging of illegal narcotics…with drugs, come guns."

"A district court may draw reasonable inferences from the facts when determining whether an enhancement applies." *United States v. Zubia*, 727 F. App'x 86, 87 (5th Cir. 2018) (citing *United States v. Juarez*, 626 F.3d 246,

17

251 (5th Cir. 2010)).  Because Bass was in possession of a loaded handgun and a full magazine, while in possession of distribution amounts of controlled substances, we find that the district court did not err by enhancing Bass's offense level by four levels for being a felon in possession of a firearm.

## V.

For the foregoing reasons, we AFFIRM the district court's denial of the motion to suppress and find the district court did not err in the application of the ACCA and firearm enhancements at sentencing.